## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |  |
|---|---|---|
| DEBRA MONSERRATE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **CASE NO. 6:14-cv-149-Orl-37GJK** |
| | ) | |
| HARTFORD FIRE INSURANCE | ) | |
| COMPANY, a foreign for | ) | |
| profit corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT, HARTFORD FIRE INSURANCE COMPANY'S RULE 26(a)(2) DISCLOSURE OF EXPERT TESTIMONY

Defendant, HARTFORD FIRE INSURANCE COMPANY (hereinafter "Defendant"), by and through its undersigned counsel and pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure and this Court's Case Management and Scheduling Order dated February 4, 2015 [Dkt. 113] discloses the identity of the witness it may use at trial to present testimony under Federal Rule of Evidence 702, 703 or 705 as follows:

> Dr. Eric John Mitchem
> Economists Incorporated
> 2308 Killearn Center Boulevard, Building B
> Tallahassee, Florida 32309
> (850) 558-6037

Dr. Mitchem may testify as a labor economist and economic expert. A copy of Dr. Mitchem's expert report, Curriculum Vitae, a list of all other cases in which he has testified as an expert witness at trial or by deposition in the previous 4 years and fee schedule are attached hereto and served herewith.

DATED this 1st day of July, 2015.

Respectfully submitted,

JACKSON LEWIS P.C.
390 North Orange Avenue, Suite 1285
Post Office Box 3389
Orlando, Florida 32802-3389
Telephone:     (407) 246-8440
Facsimile:     (407) 246-8441

By:   _____
      Donald C. Works, III
      Florida Bar No.  340308
      worksd@jacksonlewis.com

      David R. Golder (*Pro Hac Vice*)
      JACKSON LEWIS P.C.
      90 State House Square, 8th FL
      Hartford, CT 06103
      Telephone:     (860) 522-0404
      Facsimile:     (860) 247-1330
      golderd@jacksonlewis.com

Attorneys for Defendant HARTFORD FIRE
INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of July, the foregoing disclosure, together with copies of the expert report and items identified therein, were sent by Email, facsimile and U.S. Mail Delivery to:  Mary E. Lytle, Esquire and David Barszcz, Esquire, Lytle & Barszcz, 543 N. Wymore Road, Suite 109, Maitland, FL 32751.

_____
Donald C. Works, III

4816-6814-1861, v.  1

**Report of Eric John Mitchem, Ph.D.**

*Debra Monserrate, et al., vs. Hartford Fire Insurance Company*

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**Case No. 6:14-cv-149-Orl-37GJK**

**Economists Incorporated**
**Tallahassee, Florida**
**July 1, 2015**

My name is Eric John Mitchem.  I am a labor economist with experience in statistical analyses of employment practices, in complex data analysis and in selecting and working with representative samples of population data.  I have a Bachelor's degree in Economics from Virginia Polytechnic Institute and State University, which I completed in 2000, and a Ph.D. in Economics from Texas A&M University, which I completed in 2007.  From August 2007 until December 2014, I was employed by Economic Research Services (ERS) Group in Tallahassee, Florida.  ERS Group is a research and consulting firm whose professionals work with individuals, government agencies, colleges and universities, corporations and other organizations to statistically analyze employment decision-making processes.  I am currently employed by Economists Incorporated (EI), an economic consulting firm specializing in the fields of law and economics, public policy and business strategy.  I am also an adjunct professor in the Economics Department of Florida State University teaching a graduate course in data analysis.  My fields of special interest include applied econometrics, statistics and computer analysis of large databases, particularly in the field of labor economics.   I have worked on numerous class and collective action matters alleging wage and hours violations under the FLSA and various state laws.  I also have extensive experience in statistical analysis of claims of employment discrimination.  Appendix A provides an outline of my credentials.[1]

I have been asked by counsel for defendant, Hartford Fire Insurance Company (The Hartford), to review the available data and documents for eleven opt-in plaintiffs.  Specifically, I have been asked to review logs from plaintiffs' work computers and determine if the information can be used as a reliable measure of the number of hours worked.  If the computer logs are reasonably complete and accurate, I have been asked to measure the number of hours plaintiffs worked each week and determine the value of unpaid overtime plaintiffs are allegedly owed, if any, should it be determined that The Harford was required to compensate them for overtime work in excess of 40 hours in a week.  Additionally, I have been asked to provide my opinion about the applicability of the work experiences of the eleven opt-in plaintiffs to a larger putative class.[2]

---

[1] Economists Incorporated charges $425 per hour for the time that I spend on this matter and $260-$425 per hour for the services others at EI provide.
[2] This report is based on information available to me as of July 1, 2015.  Should additional information become available or other issues arise, I may amend or supplement this report.

### *Summary of Opinion*

In my opinion, the computer logs provide a valuable description of plaintiffs' work habits while employed at The Hartford. The number of hours between the time plaintiffs logged into the computer at the beginning of the day through the final logout time of the day is consistent with plaintiffs' claims about their work schedules. The computer log data show that the number of work hours fluctuated from week-to-week often, but not always, exceeding 40 hours in a week. On average, the eleven plaintiffs worked 42.1 hours per week, however, hours varied from plaintiff-to-plaintiff. Mr. Harris worked 48.4 hours per week, on average, from July 17, 2011 to April 26, 2014, more than any other plaintiff. Mr. Faber had the lowest average weekly hours of 33.6 per week. If it is determined that the plaintiffs should have been paid overtime, the total value of unpaid overtime owed to the eleven plaintiffs is $32,526 or $51,856, assuming the period of The Hartford's liability extends two or three years prior to the date each plaintiff joined the case, respectively.

As the eleven opt-in plaintiffs do not constitute a scientifically selected sample and given the individual variation in work schedules described in this report, the data, statistics, calculations and summaries for the plaintiffs should not be considered representative of a larger class of employees. Analysis of overtime hours worked should be conducted on an individualized basis. If an individualized approach is not feasible, then great care should be taken to select a sample from the larger population using commonly accepted scientific methods to limit sampling error and avoid a potentially biased and misleading sample.

### *Data and Documents*

The list of data and documents upon which I relied to prepare this report include:

- Plaintiffs' Second Amended Complaint and Demand for Jury Trial filed on June 9, 2014;
- a list of the eleven opt-in plaintiffs including the date each plaintiff filed consent to participate in the case;
- Deposition Transcripts for Debra Monserrate (February 9, 2015), Kelly Birchell (February 17, 2015), Amy Fernandez (February 24, 2015), William Faber (February 23, 2015) and Shawn Craft (February 20, 2015);
- Kelly Birchell's Responses to Court Interrogatories filed June 6, 2014, Shawn Craft's Responses to Court Interrogatories filed June 6, 2014, Vivian Edward's Responses to Court Interrogatories filed June 5, 2014, Plaintiff Antoinette Elkin's Notice of

Compliance with Scheduling Order filed January 9, 2015, Bill Faber's Responses to Court Interrogatories filed June 6, 2014, Plaintiffs' Notice of Compliance with Scheduling Order filed September 17, 2014 (Amy Fernandez), Paul Harris' Responses to Court Interrogatories filed July 11, 2014, Reid Mayback's Responses to Court Interrogatories filed June 5, 2014, Debra Monserrate's Responses to Court Interrogatories filed June 5, 2014, Nathan Rudger's Responses to Court Interrogatories filed July 11, 2014, and Plaintiff Laura Smith's Notice of Compliance with Scheduling Order filed February 6, 2015;

- Job Profiles and Employment Histories for Debra Monserrate, Kelly Birchell, Nathan Rudgers, Paul Harris, Reid Mayback, Shawn Craft, Vivian Edwards, Bill Faber, Amy Fernandez and Laura Smith;
- Earnings Statements and Check Stubs for each of the eleven plaintiffs;
- Computer Logs for each plaintiff labeled *Data from DCS Claims System*; and
- the Code of Federal Regulations (CFR) §778.113 and §778.114 and various texts cited within.

## *Background*

Plaintiffs are long-term disability claims analysts currently or formerly employed by The Hartford in Maitland, FL and Lake Mary, FL. As a part of their jobs, plaintiffs reviewed and processed insurance claims made by persons covered under insurance policies written by The Hartford.[3] Some of the plaintiffs worked solely at the office while others also worked from home. The work performed by the plaintiffs was conducted on a computer regardless of whether at home or in the office.[4] Ms. Birchell, for example, was issued a laptop computer, a docking station and an extra monitor to use while working at home. She could take the laptop back and forth from home to the office.[5] During periods of her employment, Ms. Fernandez would gain access through her personal computer while at other times she had a laptop computer issued by the Defendant.[6] Ms. Monserrate did not work from home.[7]

---

[3] Plaintiffs held a variety of job titles including but not limited to *CAR Specialty Analyst, LTD Claims Analyst V, LTD Claims Ability Analyst, LTD Sr. Claims Ability Analyst* and *Sr. Claims Ability Analyst*. I have no opinion about the similarity in job requirements or work performed by plaintiffs or others employed by The Hartford under these or any other job titles. Nor do I have any opinion about whether the work performed by plaintiffs or other potentially similarly situated employees qualifies them as exempt or non-exempt under the Fair Labor Standard Act (FLSA).
[4] While working at home, plaintiffs either worked on a computer provided by The Hartford or through the use of a token on their personal computer.
[5] February 17, 2015 Deposition of Kelly Birchell, page 9.
[6] February 24, 2015 Deposition of Amy Fernandez, page 9.

Plaintiffs were expected to work during certain core hours Monday through Friday between 9:00 AM and 3:30 PM, however, each plaintiff was allowed to set his or her own work schedule and could begin work earlier than 9:00 AM and work later than 3:30 PM. For example, Ms. Monserrate claims that she typically began work at 7:00 AM and worked until 5:00 PM on Mondays and Wednesdays and until 6:00 PM or 7:00 PM on Tuesdays, Thursdays and Fridays. She occasionally worked on Saturday but never on Sunday.[8] Ms. Fernandez did not begin work until 8:00 AM and normally would depart before 6:00 PM during the workweek. She also stated that some analysts came in very early while others maintained a later schedule.[9]

Plaintiffs were paid a fixed salary, typically expressed as an annual rate, regardless of the number of hours worked, however few or many. They claim that the number of hours worked each week consistently exceeded 40 and they should have been paid overtime in addition to their salary. The number of overtime hours each plaintiff claims to have worked varies from individual-to-individual. For example, Mr. Harris claims to have worked 15 to 20 hours of overtime each week. However, Mr. Mayback claims only 10 to 15 overtime hours per week while Ms. Monserrate claims 15 to 20.5 hours of overtime per week. Ms. Smith claims to have worked 3, 6, 7.5, 10 or 15 hours of overtime per week, a number that varied throughout her tenure.[10]

### *Summary of Hours Worked*

The times plaintiffs were logged into their computers provide a precise and reliable measure of the number of hours worked each day and week. DCS Claims System Logger Data (hereafter computer logs) were provided for each of the eleven plaintiffs covering the relevant time period of their employment. The computer logs show the exact times that the plaintiffs logged into their computer upon arriving at work each day.[11] Additionally, the computer logs provide the times the users logged out as well as the times of other events throughout the

---

[7] February 9, 2015 Deposition of Debra Monserrate, page 75.
[8] February 9, 2015 Deposition of Debra Monserrate, pages 65-70.
[9] February 24, 2015 Deposition of Amy Fernandez, pages 49-50.
[10] See plaintiffs' individual responses to court interrogatories.
[11] Ms. Craft stated during deposition that logging onto her computer was what she ordinarily did first upon arriving at work each day. She stated that it took only two minutes to log into the computer. (February 20, 2015 Deposition of Shawn Craft, pages 44-45.) Ms. Birchell and Ms. Monserrate also stated that they first logged onto the computer upon arriving at work. (February 17, 2015 Deposition of Kelly Birchell, pages 32-33, and February 9, 2015 Deposition of Debra Monserrate, pages70-71.)

day.[12]   Table 1 illustrates an example from the computer logs for Ms. Monserrate for Tuesday, February 28, 2012.

### Table 1: Example of Computer Log
#### Debra Monserrate

| User ID | Computer Log Event Description | Date and Time |
|---------|-------------------------------|---------------|
| DM51259 | Workstation Login | 2/28/12 6:50 AM |
| DM51259 | Citrix Login | 2/28/12 6:55 AM |
| DM51259 | Logoff | 2/28/12 2:56 PM |
| DM51259 | Workstation Login | 2/28/12 3:01 PM |
| DM51259 | Logoff | 2/28/12 6:29 PM |
| DM51259 | Logoff | 2/28/12 6:39 PM |

The computer logs show that Ms. Monserrate logged into her workstation at 6:50 AM the morning of Tuesday, February 28, 2012.  The second record in the table indicates that a *Citrix Login* occurred five minutes later, which indicates the time she first accessed the DCS Claims System.   A *Logoff* event occurred at 2:56 PM and Ms. Monserrate logged back into her workstation five minutes later at 3:01 PM.   Two additional log entries are stored, both of which are *Logoff* events.  The computer logs indicate that the last two logoff events occurred at 6:29 PM and 6:39 PM.  If it is assumed that she worked continuously throughout the day and the first login time and the last logoff time are used to measure the number of hours worked, Ms. Monserrate's workday began at 6:50 AM and ended at 6:39 PM for a total of 11.8 hours. This is consistent with the schedule she claims to have worked while employed at The Hartford.  She stated that on Tuesdays, Thursdays and Fridays she typically worked from 7:00 AM until 6:00 PM or 7:00 PM, or 10 to 12 hours per day.

Table 2 shows the earliest login and latest logoff time for each day during the week of February 26, 2012 through March 3, 2012 for Ms. Monserrate.  The computer logs indicate that she worked 9.4 hours on Monday, 11.8 hours on Tuesday, 11.3 hours on Wednesday, 11.8 hours on Thursday, 12.1 hours on Friday and 4.4 hours on Saturday.  In total, this data suggest she worked 60.8 hours during this workweek.  This is again consistent with the number of hours she claims to have worked while employed by The Hartford.  The computer logs seem to confirm Ms. Monserrate's weekly routine of leaving early on Mondays to attend

---

[12] The computer log data contains a number of fields not considered in this analysis such as the computer domain and IP address.  Only the user's ID number, the date and time of each computer log event and the descriptions of the computer log events were used to measure plaintiffs' work times.

a workout class showing that she logged off of the computer at 4:42 PM. Also, the times recorded by the computer are consistent with her statements about her work schedule when working on Saturdays. She claims that, if she worked on a Saturday, then she would begin at approximately 10:30 AM to 11:00 AM and work until 3:00 PM or 4:00 PM.[13]

### Table 2: Example Workweek From Computer Logs
#### Debra Monserrate
#### Week Beginning February 26, 2012 and Ending March 3, 2012

| User ID | Weekday | Earliest Login Time | Latest Logout Time | Number of Hours |
|---|---|---|---|---|
| DM51259 | Monday | 2/27/2012 7:20 AM | 2/27/2012 4:42 PM | 9.4 |
| DM51259 | Tuesday | 2/28/2012 6:50 AM | 2/28/2012 6:39 PM | 11.8 |
| DM51259 | Wednesday | 2/29/2012 8:21 AM | 2/29/2012 7:39 PM | 11.3 |
| DM51259 | Thursday | 3/1/2012 8:33 AM | 3/1/2012 8:21 PM | 11.8 |
| DM51259 | Friday | 3/2/2012 7:06 AM | 3/2/2012 7:11 PM | 12.1 |
| DM51259 | Saturday | 3/3/2012 11:57 AM | 3/3/2012 4:24 PM | 4.4 |

Total Hours for the Week:   60.8

Although Ms. Monserrate's description of her schedule and claim of 50 to 60 hours of work per week is often consistent with the computer logs, the number of hours she worked varied from week-to-week. Figure 1 below illustrates the fluctuation in her weekly work hours. As she describes, her workweek often consisted of 50 to 60 hours per week, which occurred 38.9% of the time. However, she was nearly as likely to have worked between 40 and 50 hours per week, which occurred 30.0% of the time during her employment at The Hartford. Approximately 10% of her workweeks consisted of 60 or more hours. While she usually worked 40 or more hours per week, she worked fewer than 40 hours during 21.1% of the workweeks and fewer than 20 hours 5.6% of the time. During her tenure at The Hartford from April 1, 2011 to February 16, 2013, according to the computer records, Ms. Monserrate worked 47.3 hours per week, on average, which is lower than the 50 to 60 hour average workweek she has proffered.

---

[13] February 9, 2015 Deposition of Debra Monserrate, pages 69-70.



**Figure 1: Distribution of Weekly Hours**
**Debra Monserrate**
**April 1, 2011 to February 16, 2013**

| | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 5 | 3 | 11 | 27 | 35 | 9 |
| Percent of Weeks | 5.6% | 3.3% | 12.2% | 30.0% | 38.9% | 10.0% |

The work schedule maintained by Mr. Faber is different than Ms. Monserrate's schedule. Mr. Faber stated that on weekdays, Monday through Friday, he arrived at work at approximately 7:00 AM to 7:30 AM and normally left for the day at 3:30 PM or 4:00 PM. Table 3 shows Mr. Faber's earliest login and latest logoff times for the week of May 20, 2012 through May 26, 2012, which are consistent with Mr. Faber's statements about his schedule. He logged into his workstation shortly after 7:30 AM each morning during the week and logged off at approximately 3:30 PM each afternoon. Mr. Faber did not work Saturday or Sunday during this workweek and, in total, worked only 38.6 hours according to the computer logs.

**Table 3: Example of Workweek Using Computer Logs**
**William (Bill) Faber**
**Week Beginning May 20, 2012 and Ending May 26, 2012**

| User ID | Weekday | Earliest Login Time | Latest Logout Time | Number of Hours |
|---|---|---|---|---|
| WF80426 | Monday | 5/21/12 7:41 AM | 5/21/12 3:28 PM | 7.8 |
| WF80426 | Tuesday | 5/22/12 7:39 AM | 5/22/12 3:28 PM | 7.8 |
| WF80426 | Wednesday | 5/23/12 7:46 AM | 5/23/12 3:29 PM | 7.7 |
| WF80426 | Thursday | 5/24/12 7:48 AM | 5/24/12 3:28 PM | 7.7 |
| WF80426 | Friday | 5/25/12 7:53 AM | 5/25/12 3:30 PM | 7.6 |

Total Hours for the Week:   38.6

Unlike Ms. Monserrate, Mr. Faber did not often work more than 40 hours per week. Figure 2 summarizes the fluctuation in his weekly hours from April 3, 2011 through January 19, 2013. The typical workweek for Mr. Faber consisted of 30 to 40 hours, which occurred in 50.0% of

the weeks during this time period.  Mr. Faber worked 40 or more hours in only 30.0% of the workweeks and never worked more than 60 hours in a week.  Rarely, only 2.6% of the time, did he work 50 or more hours.



*Figure 2: Distribution of Weekly Hours*
*William (Bill) Faber*
*April 3, 2011 to January 19, 2013*



| | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 12 | 6 | 39 | 19 | 2 | 0 |
| Percent of Weeks | 15.4% | 7.7% | 50.0% | 24.4% | 2.6% | 0.0% |

The computer log records for each of the eleven plaintiffs were examined to determine the number of weekly hours worked during the time periods potentially relevant to this case.  As described above for Ms. Monserrate and Mr. Faber, the difference between the time of the first login and the time of the last logoff each day is used to measure the number of hours worked.[14]  This measure assumes that plaintiffs were continuously working and likely overstates the number of work hours if plaintiffs stopped working in the middle of the day for lunch, to go to an appointment, to drive home (for those who may have worked from home) or any other reason.  For each workweek, beginning on Sunday and ending on Saturday, the daily work hours measured by the computer logs are summed to measure weekly work hours.

Collectively, the computer logs show the number of hours varied from week-to-week for the eleven plaintiffs.  Figure 3 summarizes the distribution of plaintiffs' weekly hours.  The data show that plaintiffs worked 40 to 50 hours per week most commonly, which only occurred 44.6% of the time.  More than 50 hours was not as common.  During this time period, plaintiffs worked 50 to 60 hours per week 18.2% of the time and 60 or more hours per week

---

[14] If the computer logs indicate the plaintiff worked past midnight then the time worked after midnight was included on the previous day.  All logout times after midnight but before 3:00 AM are included in the amount of time worked by the plaintiffs.  When the computer logs appear incomplete, showing a login time but no logoff time for the day, then it is assumed that the plaintiff worked a typical day and the plaintiff's mean number of daily computer log hours is used for that workday.

in only 4.1% of the workweeks.  During 33.2% of the workweeks, plaintiffs worked fewer than 40 hours according to the computer log data.



**Figure 3: Distribution of Weekly Hours**
*All Opt-In Plaintiffs*
*April 1, 2011 to October 4, 2014*

|  | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 61 | 70 | 227 | 481 | 196 | 44 |
| Percent of Weeks | 5.7% | 6.5% | 21.0% | 44.6% | 18.2% | 4.1% |

Each of the eleven plaintiffs determined their own work schedule and, as a result, the number of weekly hours differs from individual-to-individual.[15]  Table 4 below provides the average number of hours per week recorded in the computer logs for each plaintiff during the period April 1, 2011 through October 4, 2014.  Mr. Faber had the lowest average number of hours, 33.6.  The average weekly computer log hours were less than 40 for four other plaintiffs, Ms. Craft (35.7 hours), Ms. Edwards (39.8 hours), Mr. Mayback (38.0 hours) and Mr. Rudgers (37.8 hours).  Six of the eleven plaintiffs had more than 40 hours per week, on average, according to the computer logs including Ms. Birchell (46.4 hours), Ms. Elkins (42.3 hours), Ms. Fernandez (45.8 hours), Ms. Smith (41.1 hours), Ms. Monserrate (47.3 hours) and Mr. Harris (48.4 hours), who had the largest average number of weekly hours.

*Value of Unpaid Overtime*

The value of unpaid overtime plaintiffs' compute in their responses to interrogatories uses a regular rate of pay calculated by dividing 40 hours into the weekly salary.  The hourly rate is then multiplied by 1 ½ and applied to an estimated number of overtime hours to determine the amount of overtime pay they allegedly should have received from The Hartford.  This analysis is not consistent with the guidance provided by the regulations regarding the appropriate method to compute the regular hourly rate for salaried employees or with

---

[15] Appendix B provides the distribution of weekly hours for each of the other nine plaintiffs individually.

plaintiffs' statements in this case.  CFR §778.113 describes generally how to compute the regular rate for salaried employees:

> If the employee is employed solely on a weekly salary basis, his regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate.

The number of hours the salary is *intended to compensate* is the appropriate denominator for the calculation of the regular rate for salaried employees.  In the present case, when asked in deposition, plaintiffs agreed that their salary covers straight time for all hours worked during the workweek.[16]  Additionally, I am unaware of any claim by plaintiffs that their salary was intended to cover only 40 hours of work per week or any other number of hours.  This suggests plaintiffs' salaries were intended to cover all hours worked in a week and the regular hourly rate is appropriately computed by dividing the weekly salary by the total number of hours worked each week.  When the number of hours exceeds 40 in a week, each overtime hour in excess of 40 should be paid at ½ times the regular rate for that week.[17]

### Table 4: Number of Overtime Hours and Value of Alleged Unpaid Overtime
### Three Year Liability Period

| Plaintiff | From Week Beginning | To Week Ending | Number of Workweeks | Average Hours per Workweek | Average Overtime Hours per Workweek | Total Number of Overtime Hours | Total Value of Unpaid Overtime |
|---|---|---|---|---|---|---|---|
| Kelly Birchell | 3/27/2011 | 8/20/2011 | 21 | 46.4 | 9.5 | 200.3 | $1,949 |
| Shawn Craft | 4/3/2011 | 7/21/2012 | 47 | 35.7 | 3.0 | 138.8 | $1,442 |
| Vivian Edwards | 4/3/2011 | 4/21/2012 | 48 | 39.8 | 1.6 | 75.8 | $1,007 |
| Antoinette Elkins | 11/13/2011 | 10/4/2014 | 146 | 42.3 | 5.0 | 729.9 | $8,608 |
| Bill Faber | 4/3/2011 | 1/19/2013 | 78 | 33.6 | 1.0 | 79.6 | $656 |
| Amy Fernandez | 9/11/2011 | 10/4/2014 | 159 | 45.8 | 8.6 | 1,362.4 | $10,174 |
| Paul Harris | 7/17/2011 | 4/26/2014 | 145 | 48.4 | 10.2 | 1,476.6 | $10,715 |
| Reid Mayback | 4/3/2011 | 6/9/2012 | 60 | 38.0 | 2.4 | 142.1 | $1,408 |
| Debra Monserrate | 3/27/2011 | 2/16/2013 | 90 | 47.3 | 9.7 | 872.8 | $7,264 |
| Nathan Rudgers | 5/29/2011 | 3/15/2014 | 135 | 37.8 | 1.6 | 211.1 | $3,188 |
| Laura Smith | 9/11/2011 | 8/2/2014 | 150 | 41.1 | 4.0 | 593.9 | $5,445 |
| All Opt-In Plaintiffs | 3/27/2011 | 10/4/2014 | 1,079 | 42.1 | 5.5 | 5,883.3 | $51,856 |

While hours worked and overtime is measured on a weekly basis for each plaintiff, Table 4 summarizes the total value of unpaid overtime allegedly due if the period of liability extends three years prior to the date each consented to participate in this litigation.  As the plaintiffs'

---

[16] February 9, 2015 Deposition of Debra Monserrate, page 21.  February 17, 2015 Deposition of Kelly Birchell, page 13.  February 20, 2015 Deposition of Shawn Craft, page 15.  February 23, 2015 Deposition of William Faber, page 16.
[17] CFR §778.113 and §778.114.

schedules, weekly hours, salaries and workweeks varied, the number of overtime hours and the value of unpaid overtime varies across the individuals. During the three year liability period, Ms. Edwards worked 75.8 overtime hours, the lowest among the eleven plaintiffs, while Mr. Harris had the largest number of overtime hours, 1,476.6. The value of alleged unpaid overtime for each plaintiff ranges from $656 to $10,715 during the three year period of liability.

The bottom of Table 4 provides a summary of the value of unpaid overtime for the eleven plaintiffs combined. The plaintiffs collectively worked 5,883.3 overtime hours between April 1, 2011 and October 4, 2014, according to the times they were logged into their computers. If it is determined that the eleven plaintiffs were misclassified as exempt from overtime compensation, then the value of the overtime during this period is $51,856.

**Table 5: Number of Overtime Hours and Value of Alleged Unpaid Overtime**
*Two Year Liability Period*

| Plaintiff | From Week Beginning | To Week Ending | Number of Workweeks | Average Hours per Workweek | Average Overtime Hours per Workweek | Total Number of Overtime Hours | Total Value of Unpaid Overtime |
|---|---|---|---|---|---|---|---|
| Kelly Birchell | --- | --- | 0 | --- | --- | --- | --- |
| Shawn Craft | 4/1/2012 | 7/21/2012 | 6 | 34.7 | 0.4 | 2.2 | $30 |
| Vivian Edwards | 4/1/2012 | 4/21/2012 | 3 | 40.5 | 0.9 | 2.8 | $38 |
| Antoinette Elkins | 11/11/2012 | 10/4/2014 | 96 | 43.0 | 5.6 | 537.6 | $6,292 |
| Bill Faber | 4/1/2012 | 1/19/2013 | 29 | 27.2 | 0.3 | 7.4 | $63 |
| Amy Fernandez | 8/5/2012 | 10/4/2014 | 112 | 45.3 | 8.3 | 933.8 | $7,250 |
| Paul Harris | 5/27/2012 | 4/26/2014 | 100 | 49.5 | 11.6 | 1,155.9 | $8,327 |
| Reid Mayback | 4/1/2012 | 6/9/2012 | 10 | 33.3 | 1.0 | 9.6 | $97 |
| Debra Monserrate | 4/1/2012 | 2/16/2013 | 41 | 48.4 | 11.4 | 467.1 | $3,832 |
| Nathan Rudgers | 5/27/2012 | 3/15/2014 | 87 | 37.3 | 1.5 | 133.8 | $2,019 |
| Laura Smith | 7/8/2012 | 8/2/2014 | 108 | 41.6 | 4.7 | 503.7 | $4,578 |
| All Opt-In Plaintiffs | 4/1/2012 | 10/4/2014 | 592 | 42.8 | 6.3 | 3,753.9 | $32,526 |

Table 5 summarizes the number of workweeks, weekly hours, overtime hours and the value of unpaid overtime if the period of liability extends only two years prior to the date each plaintiff filed consent to participate in the case. The value of unpaid overtime varies from a low of $30 for Ms. Craft to a high of $8,327 for Mr. Harris during the two year liability period.[18] The plaintiffs worked 3,753.9 overtime hours collectively and the value of their overtime is $32,526 during these workweeks.

---

[18] Ms. Birchell did not work any week during the period beginning two years prior to her consent date as her employment with The Hartford terminated in August 2011.

Although the evidence available to me at the time of this report suggests plaintiffs' salaries were intended to cover all hours worked in a week, however few or many, if the fact-finder determines that their salaries consisted of compensation for up to 40 hours per week then I have computed an alternative value of unpaid overtime using the hours measured from the computer logs. Appendices C and D show the values of unpaid overtime for each plaintiff, and for all plaintiffs collectively, when their weekly salaries are divided by 40 hours to determine the regular hourly rate of pay, over a three year and a two year liability period, respectively. The plaintiff specific overtime rates are computed for each workweek as 1 ½ times the regular rate and applied to each overtime hour in excess of 40 hours per week.

### Applicability to Other Employees

The analysis of a sample or subgroup is a commonly used scientific method of efficiently drawing inference about a larger population. Once a sample is properly chosen, statistical measures of the sample provide estimates of one or more characteristics of the larger population. The sample is *representative* of the larger population only when it is chosen using sound methods, a fact often considered in litigation. In a simple random sample, a commonly used approach, each member of the population has an equal probability of being chosen for the sample. A stratified random sample is another commonly used method in which individuals are organized into meaningful groups or strata and then a random sample is taken from each group. Stratified random sampling is appropriate when an inference about each group is desired. It may be preferred to simple random sampling when substantial variation exists across groups.[19] Simple and stratified random samples can be selected using a computer program once the population of interest is defined.[20]

A *biased* sample is one that produces estimates that are not representative of the population of interest. A sample contains nonresponse error when individuals chosen for the sample are not available, refuse to participate or are deemed ineligible for participation for various reasons. Nonresponse may create a biased sample if those who choose to participate are systematically different than the population of interest. Relying on a conveniently available sample, such as the eleven opt-in plaintiffs in this case, will likely lead to *selection bias* and may produce inferences that are misleading when applied to a larger population.

---

[19] For more information about types of sampling see, for example, Barnes, David W. and Conley, John M. (1986). *Statistical Evidence in Litigation* (pp. 249-263). Boston: Little, Brown and Company.
[20] Other sampling methods, such as clustered sampling, may be appropriate in some cases.

Before drawing conclusions from sample data, the investigator should also consider sampling error. Sampling error occurs because a sample cannot give complete information about a population and exists even when a sample is properly constructed. Sampling error differs from the bias introduced by nonresponse and convenience sampling which is also known as non-sampling error. Sampling error can be measured, whereas non-sampling error cannot.[21] The sampling error, which depends on both the sample size and the amount of variation in the alleged unpaid work, is larger when using smaller samples than when using larger samples, all else equal.

The analysis described in this report using data for eleven opt-in plaintiffs should not be applied to other employees or putative class members. At a minimum, the exercise should provide evidence of the need for an individualized approach given the variation in schedules and weekly hours. Moreover, the eleven plaintiffs were not selected in a scientific manner and any inference drawn about a larger putative class of employees may be biased and misleading. If the number of putative class members is too large to construct an individualized analysis, and it is determined that a representative sample should be constructed, then great care and consideration should be taken to ensure the sample is chosen scientifically.

_Eric J. Mitchem_          7/1/2015
Eric J. Mitchem              Date

---

[21] For a discussion on sampling and non-sampling error see Scheaffer, Richard L., Mendenhall, William, and Ott, Lyman (1990). *Elementary Survey Sampling, Fourth Edition* (pp. 33-38). Boston: PWS-KENT Publishing Company.



# Appendix A

## Eric John Mitchem

*2308 Killearn Center Boulevard · Tallahassee, Florida · (850) 558-6037*
*mitchem.e@ei.com*

**Professional Experience**

### Economists Incorporated
· Vice President (2014 – Present)

Apply economic, econometric and statistical analysis to employment litigation, EEOC investigations, OFCCP audits and pro-active self-monitoring studies. Consult with corporations, government contractors and law firms on employment discrimination matters to monitor and assess the risk of litigation or government investigation for various occupations and industries. Work closely with clients to design statistical models consistent with the employer's hiring, promotion, performance evaluation, compensation, termination and reduction-in-force decisions. Assist clients in identifying the data required to conduct thorough analyses of their workforce and excels at preparing and analyzing extremely large and complex human resources data.

Conduct quantitative data analysis designed to help attorneys assess the value and merits of Fair Labor Standards Act (FLSA) and state wage and hour claims including misclassification, missed meal/rest periods, donning/doffing, off-the-clock work, unpaid overtime and regular rate calculations. Provide opinion about the appropriateness of applying class-wide inference using representative trial witnesses in FLSA claims of misclassified employees and unpaid off-the-clock work. Assist companies with extracting, compiling and summarizing archived data from payroll and timekeeping systems, as well as unconventional systems such as computer logs, to evaluate wage and hour claims. Compute waiting time penalties and PAGA penalties in California wage claims.

Testify in court and arbitration hearings and has prepared written reports and declarations.

### Economic Research Services (ERS) Group
· Principal (2013 – 2014)
· Senior Economist (2011 – 2013)
· Research Economist (2007 – 2011)

Design and manage statistical analyses of employment decisions including hiring, promotion, termination and compensation. Prepare analyses for employers in response to litigation, EEOC investigations and OFCCP audits. Design programs to analyze and monitor the employment practices of public and private organizations. Prepare computerized analyses of personnel and human resources data for litigation support in wage and hour cases. Estimate the value of economic losses. Apply academic and professional literature in economics and other fields to employment decisions made by client firms, universities, institutions and government agencies. Coordinate the daily activities of computer programmers, research associates and other labor economists and develop in-house training programs to enhance technical skills in programming and statistical software packages such as SAS, Stata and SPSS.



# Appendix A

**Professional Experience (Continued)**

### Florida State University
· Adjunct Professor (2015)

Taught a SAS programming and economic data analysis course in the Master's Program in Applied Economics.

### Texas A&M University
· Graduate Instructor (2004 – 2007)
· Research Assistant (2003 – 2007)
· Teaching Assistant (2002 – 2007)

Taught undergraduate courses in Labor Economics, Intermediate Microeconomic Theory, Principles of Microeconomics and Introductory Econometrics (with Stata).

Performed statistical analyses of complex data at the direction of professors in the Department of Economics and the Bush School of Government & Public Policy using SAS and Stata. Researched, collected and organized data on public school teachers, principals, superintendents and other staff in the state of Texas for academic research in labor economics and compensation studies for the state legislature.

### Law and Economics Consulting Group (LECG)
· Research Analyst (2002)

Performed data analyses of antitrust and competition policy issues at the direction of Ph.D. economists and experts.

### Capital Economics
· Economic Analyst (2001 – 2002)

Provided general litigation support for Ph.D. economists by preparing tables and exhibits, collecting and organizing data and analysis of data for the review and submission process for interrogatory responses requested from various federal agencies in antitrust matters.

**Education**

· Ph.D., Economics, Texas A&M University (2007)

· B.A., Virginia Polytechnic Institute and State University (2000)

**Specialization**

Labor Economics, Econometrics, Applied Microeconomics, Data Analysis



# Appendix A

## Presentations/Professional Meetings

"Seeing Through Statistics: The Role of a Labor Economist in Litigation," presented to the Worklaw Network, Beverly Hills, CA (April 2015)

"Economists in Employment Litigation," Hendrix College, Conway, AR (April 2009, February 2013)

"Do Certification Requirements Discourage Quality Entrants?  The Market for Public School Administrators," Midwest Economics Association, Annual Conference, Chicago, IL (March 2006)

"Gender and Promotion in Texas Public Schools," Private Enterprise Research Center (PERC) Applied Microeconomics Seminar Series, College Station, TX (March 2006)

"School Choice and the Compensation of School Administrators," Dissertation Development Workshop, Texas A&M University, College Station, TX (October 2006)

## Professional Associations

· American Economic Association
· American Bar Association (Section on Labor and Employment)

## Expert Reports & Testimony

Dianne Parcell v. State Of Florida, Department Of Economic Opportunity, Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, Case No. 2013-CA-1003. [declaration, testimony]

Michael Cardenas, et al., vs. McLane Foodservice, Inc., United States District Court, Central District of California, Southern Division, Case No. 8:10-cv-00473-DOC-FFM. [report]

International Longshore and Warehouse Union, Local 30 v. U.S. Borax, Inc., Arbitration, Grievance No. 2009-06 (China Subcontracting). [testimony]

Eric Thompson, et al., vs. Bruister & Associates, Inc., et al., United States District Court, Middle District of Tennessee, Nashville Division, Case No. 3:07-cv-00412. [declaration and report]

Paul Willoughby, et al., vs. Youth Villages, Inc., United States District Court, Northern District of Georgia, Atlanta Division, Civil Action No. 1:13-cv-03910-SCJ.  [report, declaration]

## Description of Selected Casework

Expert Witness, Wage and Hours: Provided opinion about the appropriateness of applying inference class-wide using plaintiffs' proposed sample of representative trial witnesses in an FLSA claim of unpaid off-the-clock work performed by satellite installation and repair technicians.



# Appendix A

## Description of Selected Casework (Continued)

**Consultant, Workforce Reorganization:** Provided statistical analyses of potential gender, race/ethnicity and age disparities in the selection and reorganization of firm-wide workforce for a national energy company. Worked with in-house counsel and management consultants before, during and after selections were made to design, analyze and document the decision making process. Provided timely feedback to the legal team prior to staffing announcements.

**Consultant, Gender Discrimination:** Performed analyses of compensation for a leader in the consumer electronics industry in response to litigation and EEOC investigation into claims of gender discrimination. Assisted the client in identifying the data required to conduct thorough analyses of their pay-setting practices.

**Consultant, Gender and Race Discrimination:** Performed regular audits for a large federal government contractor in the aerospace industry to monitor and assess possible differences in pay by gender or race/ethnicity. Developed a measure of risk of litigation or government investigation that summarizes the statistical evidence available from multiple and varied regression models. Assisted with responding to the OFCCP during compensation audits.

**Consultant, OFCCP Compensation Audits:** Assisted a global firm in the information management and electronic commerce systems industry with defining similarly situated employee groups, conducting statistical analyses and preparing data responsive to OFCCP requests during multiple audits.

**Consultant, Race Discrimination:** Organized employment and Census data to conduct workforce analyses for a large regional restaurant franchisee in response to an EEOC investigation of racial discrimination in hiring.

**Consultant, FLSA Misclassification:** Compiled, combined and organized complex payroll and work schedule data for a national retailer involved in two class action cases (FLSA and California) claiming store managers were misclassified as exempt from overtime earnings. Demonstrated that the number of hours plaintiffs claimed was inconsistent with the number of hours they scheduled themselves to work. Computed the value of alleged unpaid overtime.

**Consultant, Age Discrimination:** Designed and conducted statistical analyses of age discrimination in involuntary terminations for a national insurance provider in response to an EEOC investigation and potential litigation. Assisted the company with identifying the relevant PeopleSoft employment history data in order to conduct analyses and to respond to the EEOCs requests for information.

**Expert Witness, Union Grievance:** Prepared analyses of a Reduction-In-Force for a global metal and minerals mining company during a dispute with union represented shipping department employees. Testified during arbitration about how the timing of declining company sales corresponded with economic conditions in the U.S. and how the RIF affected union and non-union members equally.

**Consultant, Racial Discrimination:** Compiled, combined and analyzed extremely large and complex data for a national retailer involved in an EEOC investigation into racial discrimination in hiring stemming from disparate impact of criminal background checks and pre-employment testing.



# Appendix A

## Description of Selected Casework (Continued)

Consultant, Gender Discrimination: Designed and prepared statistical analyses of compensation for an investment banking firm involved in class action litigation and EEOC investigation.

Consultant, Employment Discrimination: Designed and conducted statistical analyses of voluntary and involuntary terminations for evidence of gender, age or racial disparities for a large national consumer products manufacturer and distributor. Compiled and organized the companies SAP HRIS data for analysis.

Consultant, FLSA Misclassification: Compiled timekeeping data for a national inspection services firm involved in class action litigation regarding the fluctuating workweek payment method used to compensate inspectors. Computed the value of alleged unpaid overtime.

Summary Data Witness, California Wage & Hours: Identified, combined and summarized on-board, GPS-based computer logs of long-haul and short-haul tractor trailer drivers to demonstrate the amount of time spent dawning/doffing and during meal/rest breaks for a national transportation company. Prepared a written report describing the amount of time each individual plaintiff spent performing the contested activities.

Consultant, Gender Discrimination: Assisted a large national retailer in preparation of data during the class certification stage of a nation-wide Equal Pay Act case.

Consultant, Employment Discrimination: Designed and prepared analyses of pay, promotions and performance ratings for a leading automobile manufacturer.

Consultant, FLSA Misclassification: Compiled and summarized computer logs of merchandisers for a tobacco company in a FLSA misclassification case to demonstrate the number of hours worked by plaintiffs.

Consultant, Gender Discrimination: Prepared statistical analyses of gender discrimination in pay for faculty members for several public universities.

Consultant, Systemic Discrimination: Collected, organized and analyzed data for one of the country's largest interstate trucking companies involved in class-action litigation filed by the EEOC alleging a pattern-and-practice of sexual harassment in its new driver training program. Maintained client contact, analyzed data and prepared draft reports for testifying expert.

Consultant, Racial Discrimination: Analyzed data, prepared summary graphics and provided support to testifying expert at hearings before an Administrative Law Judge in a class-action hiring discrimination case filed by the EEOC against a bank. The claim alleged African-Americans were denied employment opportunities.

Consultant, Race and Gender Discrimination: Reviewed and critiqued opposing experts' analyses, prepared tables, graphs and maps summarizing the results of analyses, and assisted in the preparation of draft reports of testifying experts in a nation-wide class-action gender and racial hiring discrimination case filed against the nation's largest uniform provider.

## Appendix B: Distribution of Weekly Hours
### Kelly Birchell
### April 1, 2011 to August 20, 2011



| | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 1 | 2 | 3 | 5 | 9 | 1 |
| Percent of Weeks | 4.8% | 9.5% | 14.3% | 23.8% | 42.9% | 4.8% |

### Shawn Craft
### April 1, 2011 to August 20, 2011



| | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 5 | 9 | 16 | 11 | 4 | 2 |
| Percent of Weeks | 10.6% | 19.1% | 34.0% | 23.4% | 8.5% | 4.3% |

## Appendix B: Distribution of Weekly Hours
### Vivian Edwards
### April 3, 2011 to April 21, 2012



|  | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 1 | 4 | 11 | 32 | 0 | 0 |
| Percent of Weeks | 2.1% | 8.3% | 22.9% | 66.7% | 0.0% | 0.0% |

### Antoinette Elkins
### April 3, 2011 to April 21, 2012



|  | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 7 | 11 | 20 | 93 | 14 | 1 |
| Percent of Weeks | 4.8% | 7.5% | 13.7% | 63.7% | 9.6% | 0.7% |

## Appendix B: Distribution of Weekly Hours
### Paul Harris
### July 17, 2011 to April 26, 2014



| | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 4 | 6 | 16 | 38 | 66 | 15 |
| Percent of Weeks | 2.8% | 4.1% | 11.0% | 26.2% | 45.5% | 10.3% |

### Reid Mayback
### July 17, 2011 to April 26, 2014



| | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 2 | 7 | 22 | 26 | 3 | 0 |
| Percent of Weeks | 3.3% | 11.7% | 36.7% | 43.3% | 5.0% | 0.0% |

## Appendix B: Distribution of Weekly Hours
### Nathan Rudgers
### May 29, 2011 to March 15, 2014



| | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 6 | 11 | 34 | 84 | 0 | 0 |
| Percent of Weeks | 4.4% | 8.1% | 25.2% | 62.2% | 0.0% | 0.0% |

### Laura Smith
### May 29, 2011 to March 15, 2014



| | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 6 | 10 | 36 | 78 | 20 | 0 |
| Percent of Weeks | 4.0% | 6.7% | 24.0% | 52.0% | 13.3% | 0.0% |

**Appendix B: Distribution of Weekly Hours**
**Amy Fernandez**
**April 3, 2011 to January 19, 2013**



| | Fewer Than 20 Hours | 20 to 30 Hours | 30 to 40 Hours | 40 to 50 Hours | 50 to 60 Hours | 60 Hours or More |
|---|---|---|---|---|---|---|
| Number of Weeks | 12 | 1 | 19 | 68 | 43 | 16 |
| Percent of Weeks | 7.5% | 0.6% | 11.9% | 42.8% | 27.0% | 10.1% |

**Appendix C: Number of Overtime Hours and Value of Alleged Unpaid Overtime**
**Three Year Liability Period**
**Alternative Calculation Assuming Salary Covers 40 Hours per Week**

| Plaintiff | From Week Beginning | To Week Ending | Number of Workweeks | Average Hours per Workweek | Average Overtime Hours per Workweek | Total Number of Overtime Hours | Total Value of Unpaid Overtime |
|---|---|---|---|---|---|---|---|
| Kelly Birchell | 3/27/2011 | 8/20/2011 | 21 | 46.4 | 9.5 | 200.3 | $8,262 |
| Shawn Craft | 4/3/2011 | 7/21/2012 | 47 | 35.7 | 3.0 | 138.8 | $6,016 |
| Vivian Edwards | 4/3/2011 | 4/21/2012 | 48 | 39.8 | 1.6 | 75.8 | $3,265 |
| Antoinette Elkins | 11/13/2011 | 10/4/2014 | 146 | 42.3 | 5.0 | 729.9 | $31,271 |
| Bill Faber | 4/3/2011 | 1/19/2013 | 78 | 33.6 | 1.0 | 79.6 | $2,296 |
| Amy Fernandez | 9/11/2011 | 10/4/2014 | 159 | 45.8 | 8.6 | 1,362.4 | $41,898 |
| Paul Harris | 7/17/2011 | 4/26/2014 | 145 | 48.4 | 10.2 | 1,476.6 | $44,253 |
| Reid Mayback | 4/3/2011 | 6/9/2012 | 60 | 38.0 | 2.4 | 142.1 | $4,946 |
| Debra Monserrate | 3/27/2011 | 2/16/2013 | 90 | 47.3 | 9.7 | 872.8 | $29,658 |
| Nathan Rudgers | 5/29/2011 | 3/15/2014 | 135 | 37.8 | 1.6 | 211.1 | $10,218 |
| Laura Smith | 9/11/2011 | 8/2/2014 | 150 | 41.1 | 4.0 | 593.9 | $19,828 |
| All Opt-In Plaintiffs | 3/27/2011 | 10/4/2014 | 1,079 | 42.1 | 5.5 | 5,883.3 | $201,910 |

**Appendix D: Number of Overtime Hours and Value of Alleged Unpaid Overtime**
**Two Year Liability Period**
**Alternative Calculation Assuming Salary Covers 40 Hours per Week**

| Plaintiff | From Week Beginning | To Week Ending | Number of Workweeks | Average Hours per Workweek | Average Overtime Hours per Workweek | Total Number of Overtime Hours | Total Value of Unpaid Overtime |
|---|---|---|---|---|---|---|---|
| Kelly Birchell | --- | --- | 0 | --- | --- | --- | --- |
| Shawn Craft | 4/1/2012 | 7/21/2012 | 6 | 34.7 | 0.4 | 2.2 | $95 |
| Vivian Edwards | 4/1/2012 | 4/21/2012 | 3 | 40.5 | 0.9 | 2.8 | $121 |
| Antoinette Elkins | 11/11/2012 | 10/4/2014 | 96 | 43.0 | 5.6 | 537.6 | $23,087 |
| Bill Faber | 4/1/2012 | 1/19/2013 | 29 | 27.2 | 0.3 | 7.4 | $214 |
| Amy Fernandez | 8/5/2012 | 10/4/2014 | 112 | 45.3 | 8.3 | 933.8 | $28,918 |
| Paul Harris | 5/27/2012 | 4/26/2014 | 100 | 49.5 | 11.6 | 1,155.9 | $34,929 |
| Reid Mayback | 4/1/2012 | 6/9/2012 | 10 | 33.3 | 1.0 | 9.6 | $345 |
| Debra Monserrate | 4/1/2012 | 2/16/2013 | 41 | 48.4 | 11.4 | 467.1 | $16,019 |
| Nathan Rudgers | 5/27/2012 | 3/15/2014 | 87 | 37.3 | 1.5 | 133.8 | $6,473 |
| Laura Smith | 7/8/2012 | 8/2/2014 | 108 | 41.6 | 4.7 | 503.7 | $16,886 |
| All Opt-In Plaintiffs | 4/1/2012 | 10/4/2014 | 592 | 42.8 | 6.3 | 3,753.9 | $127,087 |